IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GAYNELLE WILLIAMS, | ) | CASE NO. 1:16-cv-00771 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Gaynelle Williams ("Plaintiff" or "Williams") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") finding that Williams' disability ended on September 1, 2010, and that Williams had not become disabled since that date.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On April 18, 2005, an Administrative Law Judge issued a fully favorable decision with respect to Williams' June 30, 2003, Supplemental Security Income application.  Tr. 93-102.   In that decision, it was determined that Williams had severe impairments consisting of severe major depression and anxiety disorder, NOS, and retained the residual functional capacity ("RFC") to perform a full range of work physically but mentally she could not "perform even unskilled work as her severe major depression and anxiety disorder NOS substantially erode[d] her ability to respond appropriately to supervisors, co-workers and usual work situations and also dealing with changes in routine work setting."  Tr. 100-101.  Considering Williams' RFC, the Administrative Law Judge concluded that Williams had been under disability since June 30, 2003.  Tr. 101.

In August 2010, the State Agency reviewed Williams' claim and determined that "[s]ignificant medical improvement ha[d] occurred since CPD [comparison point decision] of 4/18/05.  Therefore benefits . . . ceased."  Tr. 103.    Williams sought reconsideration of the decision, alleging disability due to depression and anxiety as well as new allegations of problems with her hands and shoulder.  Tr. 106.  The August 2010 cessation of benefits determination was upheld upon reconsideration and Williams requested a hearing before an Administrative Law Judge.  Tr. 106-107, 111, 137-142.   Administrative Law Judge Traci M. Hixson ("ALJ") conducted a hearing on March 8, 2012.  Tr. 33-57, 111.   Williams' representative withdrew the day prior to the hearing.  Tr. 36.  Williams opted to proceed with the hearing without a representative.  Tr. 35-36.

On June 21, 2012, the ALJ issued a decision concluding that Williams' disability ended on August 1, 2010, and she had not become disabled again since that date.  Tr. 108-123.

Williams requested review by the Appeals Council of the ALJ's June 21, 2012, decision.  Tr.

125.  The Appeals Council granted Williams' request for review and, on January 6, 2014, the

Appeals Council remanded the case back to the ALJ, finding that further proceedings were

warranted due to the denial of a request for continuance to accommodate Williams'

representative's schedule, which the Appeals Council determined resulted in Williams appearing

unrepresented at the March 8, 2012, hearing.  Tr. 124-127.   In the Appeals Council's order, the

Appeals Council stated: "[T]he Administrative Law Judge will offer the claimant an opportunity

for a hearing, take any further action needed to complete the administrative record, and issue a

new decision."  Tr. 124-125.

Pursuant to the remand order, on April 17, 2014, the ALJ conducted an administrative

hearing at which Williams appeared with her representative.  Tr. 58-92.  On September 26, 2014,

the ALJ issued an unfavorable decision.  Tr. 15-32.  In her decision, the ALJ determined that

Williams' disability ended on September 1, 2010, and that she had not become disabled again

since that date.  Tr. 18, 27.   Williams requested review of the ALJ's September 26, 2014,

decision by the Appeals Council.  Tr.12-14.  On February 4, 2016, the Appeals Council denied

Williams' request for review, making the ALJ's September 26, 2014, decision the final decision

of the Commissioner.  Tr. 1-7.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Williams was born in 1965.  Tr. 62.   At the time of the April 2014 hearing, she was

living with two adult children and one grandchild who was three years old.  Tr. 63, 85.  She was

in special education classes in school and completed school through the ninth grade.  Tr. 64, 79-

80.  She dropped out in the 10th grade because she had a baby.  Tr. 304.  Williams has some

3

difficulty with reading.  Tr. 64.  She attempted to get her GED but she got sick and stopped

pursuing it.  Tr. 69.  Williams worked on a part-time basis for the Cleveland Municipal School

District performing kitchen work.  Tr. 68.  She also worked a seasonal job at the United States

Postal Service.  Tr. 68-69.

## B.    Medical evidence

### 1.    Treatment records

#### a.    <u>Physical</u>

On March 1, 2010, Williams underwent a hysterectomy and bilateral salpingo-

oophorectomy due to problems with menometrotthagia, fibroid uterus, and anemia.  Tr. 331-332,

342-434.  She was discharged on March 4, 2010, with medications and instructions to restrict

heavy lifting and to follow up with her physician, Dr. Jay Stuart Pinkerton, two weeks later for a

post-operative visit.  Tr. 331.

On August 23, 2010, Williams saw Dr. John W. Shaffer, M.D., of University Hospitals

Case Medical Center, Department of Orthopaedics, for neck and shoulder problems.  Tr. 344.[1]

Dr. Shaffer noted that Williams had been seen by other physicians regarding her neck and

shoulder problems but her problems continued to be chronic and were recently aggravated.  Tr.

344.  On physical examination, Dr. Shaffer observed painful neck range of motion and limited

neck extension and rotation to the left.  Tr. 344.  Dr. Shaffer indicated that x-rays of the shoulder

appeared normal but his impression was cervical radiculitis and tendonitis, left shoulder.  Tr.

344.  He ordered MRIs for both the neck and shoulder and indicated he would see Williams after

the MRIs were completed.  Tr. 344.

On August 25, 2010, Williams underwent a cervical spine MRI, which showed cervical

spondylosis with narrowing of the central canal at the C5/C6 and C6/C7 levels.  Tr. 333.   An

---

[1] Dr. Shaffer's August 23, 2010, treatment notes are also located in the record at Tr. 400.

MRI of the left shoulder was attempted on August 25, 2010, but Williams was unable to lie still so adequate imaging could not be obtained.  Tr. 334.[2]

Williams saw Dr. Shaffer on December 27, 2010.  Tr. 404.  X-rays were taken of Williams' right and left hands due to hand pain. Tr. 405-406.  The x-rays showed "[n]o radiographic evidence of productive or erosive arthropathy."  Tr. 405-406.  Dr. Shaffer did observe Williams' thumbs were triggering and he administered an injection to both thumbs.  Tr. 404.  Dr. Shaffer recommended that Williams follow up with Dr. Furey regarding her cervical problems that were shown on the MRI.  Tr. 404.  Also, Dr. Shaffer recommended that Williams obtain the left shoulder MRI that she had not yet obtained.   Tr. 404.  Dr. Shaffer planned to monitor Williams' progress following her thumb injections and to see her after the left shoulder MRI was obtained.  Tr. 404.

Williams had her left shoulder MRI taken on January 1, 2011.  Tr. 407.  The MRI showed no evidence of rotator cuff tear but it did show "impingement involving the end of the acromion anterolaterally as well as the AC joint."  Tr. 407-408.  During Williams' January 17, 2011, appointment, Dr. Shaffer indicated that Williams' chronic impingement was a problem and she should consider acromioplasty with distal clavicle excision for treatment.  Tr. 408.  Dr. Shaffer also indicated that, while the injections in Williams' thumbs had decreased her pain to some extent, since Williams was still having triggering in her thumbs, it was his recommendation that Williams have trigger thumb release surgery along with the left shoulder surgery.  Tr. 408.

On February 4, 2011, Dr. Shaffer performed bilateral trigger release surgery and left shoulder open acromioplasty and distal clavicle excision.  Tr. 409-410.   On March 28, 2011, Williams saw Dr. Shaffer.  Tr. 412.  Williams was working with physical therapy to improve range of motion in her shoulder and function in her thumb.  Tr. 412.  Williams was a having a

---

[2] The August 25, 2010, MRI results are also located in the record at Tr. 402-403.

new problem with her neck.  Tr. 412.  Dr. Shaffer also recommended that Williams continue with therapy, have a spine evaluation and follow up with Dr. Shaffer in two months.  Tr. 412.

On April 22, 2011, upon Dr. Shaffer's referral, Williams saw Dr. Furey.  Tr. 413-414. On examination, Dr. Furey observed some limited range of motion in the cervical spine and some limited motion of the left shoulder secondary to the prior surgery.  Tr. 413.  Dr. Furey also observed a stable gait, ability to heel and toe walk and heel-to-toe tandem gait.  Tr. 413.  Also, Williams' strength was intact in both upper extremities without pathologic reflexes.  Tr. 413.  Dr. Furey indicated that x-rays of Williams' cervical spine taken that same day showed moderate spondylolytic changes but no acute abnormality.  Tr. 413, 415.  Dr. Furey reviewed the MRI from August 2010, which he indicated showed multilevel spondylotic changes, disk bulge and osteophyte complexes at C4-C5 through C6-C7, concentric narrowing of the canal at C5-C6, and mild foraminal stenosis bilaterally at each level but no spinal cord compression.  Tr. 413.  Dr. Furey's assessment was axial neck pain with some left cervical radiculopathy.  Tr. 413.  Dr. Furey recommended that Williams continue with therapy for her left shoulder with additional therapy directed at her neck and left arm.  Tr. 413.  Dr. Furey indicated that, after a few months, Williams might benefit from selective nerve blocks but he did not anticipate that Williams would need to consider surgery, noting that, while Williams had spondylolytic changes at several levels, overall, her spinal cord was well preserved and her foraminal stenosis was not terribly severe. Tr.  413-414.  Once Williams completed additional therapy on her shoulder, Dr. Furey wanted Williams to see the pain management group.  Tr. 414.

Williams saw Dr. Furey on May 27, 2011.  Tr. 416.  Williams had finished her left shoulder therapy but reported that she was still having a lot of pain and limited motion of her left shoulder.  Tr. 416.  Dr. Furey thought that Williams might have some cervical radiculopathy but

associated her limited motion in her left shoulder to her shoulder surgery. Tr. 416. Dr. Furey noted that Williams was due for a follow up with Dr. Shaffer. Tr. 416. Dr. Furey referred Williams to pain management for cervical nerve blocks. Tr. 416. Dr. Furey did not anticipate the need for neck surgery. Tr. 416. He stated he would see Williams back as needed. Tr. 416.

On June 10, 2011, Williams saw Dr. Al-Amin A. Khalil, M.D., for pain management. Tr. 380-381.[3] Dr. Khalil noted Williams' history of trigger thumb release and shoulder surgery in February 2011 and that, since those surgeries, Williams had been experiencing some neck pain and bilateral finger numbness and tingling. Tr. 380. Williams was not having specific pain in her bilateral upper extremities – it was mostly numbness and tingling. Tr. 380. Williams reported that she had been dropping things and her arms felt weaker. Tr. 380. Williams indicated she had tried cortisone injections in her left shoulder and physical therapy. Tr. 380. Per Williams, physical therapy made her feel worse. Tr. 380. Williams' primary care physician had prescribed Methadone for her pain and medication for anxiety. Tr. 380. Williams indicated that the Methadone helped her with the pain but it made her very sleepy. Tr. 380. On examination, Dr. Khalil noted that Williams had some tenderness on palpation in the cervical spine; she had 4/5 motor strength in her hands bilaterally; she had positive Tinel's and Phalen's tests bilaterally; she had normal reflexes in the upper extremities; and her sensation was intact in her bilateral upper extremities to pinprick. Tr. 381. Based on his review of Williams' 2010 cervical MRI and his physical examination, Dr. Khalil ordered a cervical EMG to assess whether Williams' symptoms could be related to carpal tunnel or cervical spine pathology. Tr 381.

The EMG was conducted on June 22, 2011. Tr. 419-420. The EMG revealed the following findings:

---

[3] Dr. Khalil's notes from Williams' June 10, 2011, visit are also located in the record at Tr. 417-418.

1. In the left upper extremity there is mild-to-moderate chronic left C7 radiculopathy without active denervation. No EMG evidence of carpal tunnel in the left arm.

2. In the right upper extremity there are borderline findings that are suggestive but not definitely diagnostic of a mild right median mononeuropathy at the wrist (carpal tunnel syndrome). The patient refused needle exam of the right upper extremity, so we cannot determine if there is radiculopathy in that arm as well.

Tr. 420; *see also* Tr. 421.

Williams saw Dr. Khalil on July 1, 2011, with continued complaints of left shoulder, neck and hand pain. Tr. 421-422. Williams informed Dr. Khalil that, through her attorney, she had reopened her workers' compensation case because she had not improved since her injury. Tr. 421. A physical examination revealed that Williams had decreased grip strength and finger strength in the left extremity; her sensation was decreased on the left; her reflexes were within normal limits at C5 and C6 bilaterally; she had some pain to palpation of the musculature of the shoulder and neck; and she had decreased range of motion in the left shoulder. Tr. 421. Dr. Khalil discussed with Williams her EMG results. Tr. 421. Dr. Khalil noted that his recommendation would be that Williams undergo a cervical epidural steroid injection but, since Williams had reopened her workers' compensation case, they would wait until she obtained a claim number before pursuing further treatment. Tr. 421-422.

In May, July, and August 2012, Dr. Khalil administered cervical epidural steroid injections at C6-7 and C7-T1. Tr. 426-427, 429-430, 431-432.

Williams had x-rays taken of her left shoulder on April 22, 2013, which showed widening of the AC joint. Tr. 428.

### b.    <u>Mental</u>

On April 3, 2014, Williams sought mental health treatment at Murtis Taylor.  Tr. 440-454.  Allison Arsouzy, a licensed social worker, completed an assessment.  Tr. 440-454.  Ms. Arsouzy noted the following with respect to her mental status exam – Williams was well groomed; thin; her demeanor was mistrustful and withdrawn; her eye contact was avoidant; she spoke very softly; she reported auditory and visual hallucinations; her thought process was logical, circumstantial, and racing; her mood was depressed; her affect was full; her behavior was cooperative and withdrawn; her memory, attention and concentration were impaired; and she had average intelligence.  Tr. 440-441.  Ms. Arsouzy added that Williams' "mental health is stuck around circumstances, lo[]sing her son and niece, whom were murdered."  Tr. 441.  Ms. Arsouzy's diagnoses were major depressive disorder, recurrent, severe with psychotic features and post-traumatic stress disorder.  Tr. 452.  She assessed a GAF score of 40.[4]  Tr. 452.  Ms. Arsouzy recommended that Williams have a psychiatric evaluation.  Tr. 453.

Pursuant to that recommendation, on April 16, 2014, Ellen Alalmo, Advanced Practice Nurse, conducted a psychiatric evaluation.  Tr. 455-457.  Williams indicated that she needed to speak with someone regarding all the murders in her family and stated that she had a nervous breakdown.  Tr. 455.  Williams reported flashbacks and nightmares.  Tr. 455.  Williams

---

[4] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

indicated that she felt more moody and was isolating more.  Tr. 455.  She felt very fearful, was

not sleeping well, and felt very protective of her grown children.  Tr. 455.  Williams reported

tiredness, anxiety and an inability to be around other people.  Tr. 456.  Williams indicated that

her whole family was feeling distressed; the family argued and did not get along.  Tr. 455.

Williams reported being very fearful of police officers because "her son was killed by an off duty

policeman and there was no justice."  Tr. 456.  Williams reported that she had not had treatment

in three years.  Tr. 455.  Her previous treatment providers had moved to another area.  Tr. 455.

Williams had taken Zoloft, Paxil, and Valium in the past.  Tr. 455.  She was in the hospital in

2003 for suicidal thoughts.  Tr. 455.  She indicated that, prior to the death of her mother and son

in 1999, she had never been depressed.  Tr. 455.  She was in a marriage and working.  Tr. 455.

Nurse Alalmo concluded that Williams had symptoms of post-traumatic stress disorder since her

son's death in 1999.  Tr. 457.  Nurse Alalmo prescribed Fluoxotine and Trazadone and provided

Williams with information regarding a bereavement center for grief counseling.  Tr. 457.

Williams saw Nurse Alalmo on May 7, 2014.  Tr. 458-459.  Williams relayed that her

uncle had died that day.  Tr. 458.  Nurse Alalmo noted that they would "take care of essentials

and reschedule[.]  Fluoxetine [was] started 3 weeks ago with some relief."  Tr. 458.  Nurse

Alalmo observed that William's appearance was neat and casual; she had good eye contact and

was sitting calmly.  Tr. 458.  Williams' affect was appropriate and her speech was a normal rate

and tone.  Tr. 458.  With respect to Williams' mood, she was more depressed that day.  Tr. 458.

Her sleep still was not good and she had nightmares.  Tr. 458.  However, her energy level was

"pretty good."  Tr. 458.  Williams' thought process was logical and her judgment and insight

were fair.  Tr. 458

During a June 5, 2014, appointment with Nurse Alalmo, Williams relayed that her cousin was recently murdered. Tr. 460. With respect to Williams' mood, Nurse Alalmo noted that Williams was spending time with her 13 year old grandson. Tr. 460. Williams reported feeling impatient and getting anxious. Tr. 460. She indicated that she cleaned her house to keep her mind off things. Tr. 460. Williams noted that she would like to start roller skating and bike riding. Tr. 460. Williams indicated that she had more symptoms at this time because her deceased's son's birthday was coming up. Tr. 460. Nurse Alalmo continued Williams on Fluoxotine and Trazadone and added a low dose valium for recent increased anxiety and stress. Tr. 461.

On August 28, 2014, Williams saw Nurse Alalmo. Tr. 462-465. Williams' sleep was variable. Tr. 463. She was having menopausal symptoms and getting night sweats. Tr. 463. Williams' appearance was casual and neat and she did not exhibit restless movements. Tr. 463. Her affect was restricted. Tr. 463. Williams reported more sadness and was grieving many family losses. Tr. 463-464. She reported staying at home most of the time and did not want to go out. Tr. 463-464. Williams reported seeing shadows out of the corner of her eye, hearing her deceased son calling "mom," and hearing whispers. Tr. 464. Nurse Alalmo continued Williams' medication, with an increase in the Fluoxetine dosage. Tr. 464. Nurse Alalmo provided Williams with a referral to the bereavement center. Tr. 464.

### 2. Medical opinions

#### a. <u>Physical</u>

<u>*Consultative examiner*</u>

On March 17, 2010, physician Eulogio Siosin, MD, CIME (Certified Independent Medical Examiner), saw Williams and completed a consultative evaluation. Tr. 295-299.

Williams had recently had a hysterectomy.  Tr. 295.  Williams stated that her medical problems were depression and injuries to her neck, back and left shoulder.  Tr. 295.  Williams reported that she was able to dress, groom, bathe, button, tie and grasp with pain in her left shoulder.  Tr. 295.  She could carry only 15 pounds and rated her pain as 10/10.  Tr. 295.  When she takes pain medication, it reduces her pain to 3/10.  Tr. 295.  Williams was taking Naproxen and Oxycodone.  Tr. 295.

As far as Williams' depression, she reported that she went into a deep depression in 1999 when she lost her mother and her son was murdered.  Tr. 295.  Williams indicated that she was hospitalized with suicidal thoughts and attempt in 2003.  Tr. 295.  She reported poor sleep, fair appetite but losing weight since she lost her son, and feeling tired and hopeless sometimes.  Tr. 295.  She reported memory and concentration problems but no hallucinations.  Tr. 295.  Williams believed that her medication helped calm her down.  Tr. 295.  Williams was taking Citalopram.  Tr. 295.

Williams' physical examination showed that she was 65 inches tall and weighed 99 pounds.  Tr. 295.  Williams walked normally with no assistive devices.  Tr. 295.  She declined to do heel/toe walking.  Tr. 295.  She was, however, able to get up and down from the examination table.  Tr. 295.  Williams had left shoulder tenderness and pain on range of motion.  Tr. 296.  She had no tenderness but pain on range of motion of her left hip.  Tr. 296.  Williams was able to grasp and manipulate with each hand.  Tr. 296.  She had minimal neck and moderate upper and lower back tenderness.  Tr. 296.  Straight leg raise sitting was negative; lying elicited pain in the back and left hip 60 degrees bilaterally.  Tr. 296.  Williams had no sensory deficit.  Tr. 296.  Manual muscle testing was affected by pain including in the abdomen.  Tr. 296.  Williams had no muscle atrophy.  Tr. 296.

Dr. Sioson's impression was that Williams had a 1995 work-related injury, with no gross radiculopathy, deformity or inflammatory changes in her joints; Williams had a depressed mood but was able to maintain attention and concentration; and Williams was underweight with a BMI of 16.5 – she had lost weight since her son's death.   Tr. 296.  In summary, Dr. Sioson found that:

> Based on limitation of range of motion from pain and above findings, work-related functions such as walking, standing, sitting, carrying would be impaired and limited to sedentary activities. Handling, hearing and speaking should not be affected.

Tr. 296.

*Reviewing physician - initial*

On August 2, 2010, state agency reviewing physician Esberdado Villanueva, M.D., completed a Physical RFC Assessment.  Tr. 353-360.   He opined that Williams could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday.  Tr. 354.  Dr. Villanueva explained the exertional limitations, stating that the consultative evaluation "did show normal gait [and] ability to get up and down from the table.  There [was] no evidence of synovitis, effusions and redness of the major joints but she did exhibit painful ROM in the left hip, upper and lower back tenderness and positive SLR lying down."  Tr. 354.   Further, Dr. Villanueva explained that, "[w]hile the CE did adopt to [Williams'] presentation of painful areas on examination, there [was] no objective evidence of inflammation or injuries."  Tr. 354.  Dr. Villanueva also opined that Williams could never climb ladders/ropes/scaffolds.  Tr. 355.   Dr. Villanueva found that Williams' allegations were not fully credible, stating that Williams "alleges painful conditions from working, but have not worked since she had the disability granted.  [S]he did not have any

major physical problems at the time she was granted disability from a psychological issues." Tr. 358.

*Reviewing physician - reconsideration*

Upon reconsideration, on March 17, 2011, state agency reviewing physician W. Jerry McCloud, M.D., found that the medical evidence was "insufficient to assess physical severity since the prior decision." Tr. 379.

**b.  Mental**

*Consultative examiner*

On April 30, 2010, psychologist J. Joseph Konieczny, Ph.D., conducted a psychological evaluation. Tr. 303-306.  Williams drove herself to the evaluation. Tr. 303.  She was somewhat subdued but pleasant and cooperative. Tr. 303.  When Dr. Konieczny asked Williams what her current disability was, Williams responded "It's my depression." Tr. 304.  Williams showed no problems walking or moving but did complain about pain "in [her] bones." Tr. 304.  Dr. Konieczny observed that Williams' motivation during the evaluation was adequate but noted that Williams indicated that her overall level of motivation had recently been diminished due to her physical problems. Tr. 304.  Williams appeared capable of expressing herself in a clear and coherent manner. Tr. 304.

Williams reported occasional problems with her sleep, indicating that, at times, she cannot fall asleep easily and, once asleep, she does not always sleep restfully through the night. Tr. 304.  Williams reported a history of depression following her son's death. Tr. 305.  She cries on a daily basis and has had some past thoughts of suicide and one suicide attempt. Tr. 305.  Dr. Konieczny observed no sign of nervousness or anxiety but, when asked about any ongoing feelings of anxiety, Williams stated, "My nerves are bad." Tr. 305.  Dr. Konieczny did not

observe indications of paranoid or grandiose thinking.  Tr. 305.  Williams denied experiencing auditory or visual hallucinations.  Tr. 305.  Williams showed no impairment in her ability to concentrate and attend to tasks.  Tr. 305.  Williams' insight was fair; she showed moderate deficits in her awareness of social judgment and conformity; and she showed mild deficits in her overall level of judgment.  Tr. 305.  Dr. Konieczny indicated that Williams' overall level of functioning was at a reduced level of efficiency.  Tr. 305.

With regard to activities of daily living, Dr. Konieczny noted that Williams has a driver's license but she does not drive often.  Tr. 305.  Also, he noted that Williams performs cooking, cleaning, laundry, household tasks in the home, her own shopping and she manages her own finances.  Tr. 305.  Williams is regularly involved in her church.  Tr. 305.  Otherwise, Williams is minimally involved in other outside social activities and Williams reported having no friends. Tr. 305.

Dr. Konieczny concluded that Williams suffered from major depressive disorder, recurrent, moderate, without full interepisode recovery, chronic.  Tr. 305-306.  Dr. Konieczny noted that Williams did show moderate deficits in her general fund of information and, as a result, consideration should be given to a diagnosis of borderline intellectual functioning.  Tr. 305.  However, without additional assessment, Dr. Konieczny did not offer a further diagnosis. Tr. 305-306.  Dr. Konieczny summarized his findings as follows:

> [Williams'] ability to concentrate and to attend to tasks shows no indications of impairment.  Her ability to understand and to follow directions shows no indications of impairment.  Her ability to withstand stress and pressure shows indications of moderate impairment and would appear to reflect her depression.  Similarly, her ability to relate to others and to deal with the general public shows indications of moderate impairment.  Her insight into her current situation seems fair.  She shows moderate deficits in her awareness of rules of social judgement and conformity.  She shows mild deficits in her overall level of judgement.  [Williams] currently resides with her children and participates in routine daily household responsibilities.  She would appear to require a slight

degree of supervision and monitoring in the management of her daily activities and in the handling of her financial affairs.  Her overall level of functioning is at a reduced level of efficiency.  Her symptom severity and functional severity are both at a GAF level of 50.[5]

Tr. 306.

### Reviewing psychologist - initial

On May 31, 2010, state agency reviewing psychologist Roseann Umana, Ph.D., completed a Mental RFC Assessment (Tr. 308-311) and a Psychiatric Review Technique (Tr. 312-325).

In the Psychiatric Review Technique, Dr. Umana opined that Williams had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace; and no episodes of decompensation, each of an extended duration.  Tr. 322.

In the Mental RFC, Dr. Umana rated Williams' abilities in 20 work-related areas.  Tr. 308-309.  In the category of understanding and memory, Dr. Umana opined that there was no evidence of limitation in Williams' ability to understand and remember detailed instructions and that Williams was not significantly limited in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions.  Tr. 308.

In the category of sustained concentration and persistence, Dr. Umana opined that there was no evidence of limitation in the three areas of: ability to carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and sustain an ordinary routine without special supervision.  Tr. 308.  Dr.

---

[5] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR, at 34.

Umana opined that Williams was not significantly limited in the three areas of: ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; and ability to make simple work-related decisions.  Tr. 308.  Dr. Umana opined that Williams was moderately limited in the two areas of: ability to work in coordination with or proximity to others without being distracted by them and ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 308-309.

In the category of social interaction, Dr. Umana opined that there was no evidence of limitation in the area of ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  Tr. 309.  Dr. Umana opined that Williams was not significantly limited in her ability to ask simple questions or request assistance.  Tr. 309.  Dr. Umana opined that Williams was moderately limited in the three areas of: ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 309.

In the category of adaptation, Dr. Umana opined that there was no evidence of limitation in the three areas of: ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others.  Tr. 309.  Dr. Umana opined that Williams was moderately limited in her ability to respond appropriately to changes in the work setting.  Tr. 309.

Dr. Umana explained her RFC, stating that in 2005 Williams was found to be disabled and found to have marked difficulties in dealing with coworkers and supervisors and in dealing with work stress due to diagnoses of severe major depressive disorder and anxiety NOS.  Tr. 310.  Dr. Umana indicated that Williams had shown medical improvement and had not been in treatment for years.  Tr. 310.  Dr. Umana observed that, at the recent consultative examination, Williams was diagnosed with major depressive disorder but no deficits in concentration were found; Williams' ability to understand, remember and carry out instructions was within normal limits; and her ability to relate and stress tolerance was moderately limited.  Tr. 310.   Dr. Umana gave weight to the consultative examiner's opinion and concluded that:

> [Williams] is able to understand remember and carry out simple instructions and many that are more complex.  Concentration is adequate for ordinary work settings.  Social functioning is limited, but adequate for superficial and occasional interactions.  Stress tolerance is limited. [Williams] can adapt to work settings in which duties are routine and predictable.

Tr. 310.

### Reviewing psychologist – reconsideration

Upon reconsideration, on March 16, 2011, state agency reviewing psychologist Mel Zwissler, Ph.D., completed a Mental RFC Assessment (Tr. 375-378) and a Psychiatric Review Technique (Tr. 361-374).   Dr. Zwissler's opinions regarding the extent of Williams' limitations were the same as those offered by Dr. Umana.  Tr. 371, 375-376.  In summary Dr. Zwissler explained that:

> The claimant is able to understand remember and carry out simple instructions and many that are more complex. Concentration is adequate for ordinary work settings. Social functioning is limited, but adequate for superficial and occasional interactions.  Stress tolerance is limited. Claimant can adapt to work settings in which duties are routine and predictable.

Tr. 377.

**C.      Plaintiff's testimony**

At the April 17, 2014, hearing Williams testified and was represented at the hearing by an attorney.[6]  Tr. 62-86.

Williams hurt her left shoulder while she was working at the post office.  Tr. 69.   It limits her ability to lift and limits her driving because it stiffens her neck.  Tr. 69.  She had surgery on her shoulder in 2011 but reported no improvement.  Tr. 70.  Williams tried physical therapy but it caused the left side of her body to be more tense and hurt more.  Tr. 70.  She tried injections but they did not work.  Tr. 70.  Because Williams has a lot of arthritis in her neck, an MRI was scheduled and she was waiting to hear about a second surgery.  Tr. 70, 71.   Williams was taking Tramadol pills, indicating that, "[t]hey kind of help me through the pain, which is - - they don't help."  Tr. 74.  Williams had been off her medication since the prior year because she lost her medical coverage.  Tr. 74-75.  She did not get it back until March 2014.  Tr. 74.  Since being on her medication, she had not experienced any side effects.  Tr. 74.

Williams is right-handed.  Tr. 75.  She estimated being able to lift and carry between 5 and 10 pounds with her left hand/arm.  Tr. 75.   Williams is unable to lift her left arm over her head and has difficulty lifting her arm in front of her.  Tr. 75.  She has difficulty standing and walking because her legs get weak and she gets tingling feelings.  Tr. 75.  Williams attributes the weakness in her legs to the pain in her shoulder.  Tr. 75.  She can stand about 10 or 15 minutes before she wants to sit down and she can sit for about 15 or 20 minutes before she gets stiff and needs to get up.  Tr. 75-76.  When going up and down stairs, the left side of her body starts to ache.  Tr. 76.  Williams can stoop to pick something up if she drops it.  Tr. 76.   She has a hard time holding things.  Tr. 76.  For example, when handling pots and pans, Williams will think she

---

[6] Williams also testified at the March 8, 2012, hearing.  Tr. 39-53.  At that hearing, she elected to proceed without a representative.  Tr. 35-36.

has a good grip but ends up dropping them.  Tr. 76-77.  Sometimes, she is able to take the tops of jars or bottles off but she often asks someone to take them off for her.  Tr. 77.  She is able to pick up and write with a pen.  Tr. 77.

Regarding her mental health issues, Williams explained that she lost her son in 1999 when he was 17 years old.  Tr. 71.  She indicated he was murdered and she has never gotten over the loss, stating that "there was never justice for me."  Tr. 71-72.  At the time of her son's death, she also lost her mother and she was going through a divorce.  Tr.  71-72.  Williams started counseling in 2000.  Tr. 72.  She attended counseling from 2003 through 2010 through the coroner's office.  Tr. 73-74.  Williams indicated that she had lost her niece to a murder the prior year and her death was a trigger for Williams taking her back to the death of her son.  Tr. 72.  She recently got her insurance back and started grief counseling again and was seeing a psychiatrist.  Tr. 72.  Williams was taking Prozac and sleeping pills.  Tr. 74.  When Williams is around a group of people, she starts to get anxiety which causes her to pant, her hands get sweaty, she paces, and she has to remove herself from the crowd.  Tr. 77-78.  After removing herself from the crowed, it takes her about an hour to calm herself down.  Tr.  78.  Williams has some problems remembering things like how old she is or the date of family members' birthdays. Tr.  78.  Also, she has problems staying focused.  Tr. 78-79.

Williams stated that, before her son died, before her mother died, before her divorce, before she got hurt at work, she was a different person.  Tr.  80.  Before all that, she wanted to be doing things, like skating.  Tr. 80.  Now, she cries a lot – she cries every day because she thinks about her son every day.  Tr. 81.  She also cries when she feels stressed.  Tr. 83.  She goes into her room alone and writes in a journal that she has been writing in since 1999.  Tr. 83. There are times when Williams has somewhere she is supposed to be but she does not go

because she is feeling down.  Tr.  83-84.  When Williams' family is home, she interacts with

them but they are not home a lot and she estimated spending about 19 hours a day by herself.  Tr.

81.  Williams had recently started receiving treatment at Murtis Taylor, including treatment for

her reports of hallucinations.  Tr. 84.  Williams indicated that, since her niece died, she was

hearing whispers and seeing shadows in her peripheral vision.  Tr. 84.  It had happened in the

past but started up again after her niece's death.  Tr. 84.

Williams has some difficulty reading.  Tr. 64.  She has a driver's license and drives

sometimes but she received a ride to the hearing.  Tr.  63.  Williams can prepare meals at home.

Tr. 65.  Sometimes, she washes the dishes.  Tr. 65.  Williams' daughter does the laundry.  Tr.

65.  Williams wakes up around 11:30 a.m.  Tr. 67.  After waking, she gets a cup of coffee and

sits by the window for over an hour.  Tr. 67.  Williams' daughter is home with her during the

day.  Tr. 67.  She does not talk on the telephone a lot and she does not use the computer.  Tr. 67.

She does not visit with family and friends.  Tr. 66.  She knows one of her neighbors.  Tr. 67.

Williams has some problems lifting her left arm so she has some difficulty with personal care

and hygiene.  Tr. 66.  Williams' energy level throughout the day is normally low.  Tr. 82.  She

gets tired easily.  Tr. 82.  She had a hysterectomy and she was told that her energy level would

be lowered following that procedure.  Tr. 82.  She also has anemia and she takes estrogen.  Tr.

82.

Williams attends church as often as she can and estimated that she attends church at least

twice a month.  Tr. 66.  Williams also leaves the house to go to the grocery store and to attend

doctor appointments.  Tr. 67-68.  When Williams goes grocery shopping, which is once a month,

she goes late at night because there are fewer people there at that time.  Tr. 65-66, 68.  She

usually goes grocery shopping with her cousin.  Tr.  81-82.  She thinks that she could go

shopping by herself as long as it was late at night. Tr. 82. It takes Williams two or three hours to complete her grocery shopping so she does not forget anything. Tr. 82. Williams smokes about 2 packs of cigarettes a day. Tr. 65. She does not require any medication for her breathing. Tr. 84.

## D.  **Vocational expert's testimony**

Vocational expert Susan E. Lyon ("VE") testified at the hearing. Tr. 86-91. Since Williams' postal clerk work was outside the time frame for past relevant work and the kitchen helper job was part-time, the ALJ indicated that the VE should assume no past relevant work. Tr. 87. The ALJ then asked the VE to assume a hypothetical person of the same age and education as Williams who can lift and carry 20 pounds occasionally and 10 pounds frequently with lifting and carrying being done primarily with the dominant arm and the non-dominant hand only assisting, not doing the actual lifting and carrying; can stand and walk for six hours and sit for six hours; can frequently climb stairs and ramps, but no ladders, ropes or scaffolding; can bend, balance, stoop, and kneel but no crawling; can reach in front bilaterally; can reach overhead with the dominant arm, but only shoulder level with the non-dominant arm; can handle, finger, and feel frequently; should not be exposed to hazardous conditions such as unprotected heights and moving machinery; can perform simple, routine tasks with simple, short instructions, simple decisions, and few workplace changes; would not be required to work at a fast pace, production quota type of environment; would not have to be responsible for the well-being or safety of others; only having superficial interaction with coworkers, supervisors, and the public, with superficial referring to the intensity of the interaction so there would be no negotiations and no confrontations. Tr. 88. Upon consideration of the hypothetical, the VE indicated that there would be a range of unskilled light work jobs, including (1) assembly positions performed at a

bench or table; (2) inspection positions performed at a bench or table; and (3) packaging

positions performed at a bench or table.[7]  Tr. 89.

The ALJ then modified the first hypothetical to reflect a person who can only lift and

carry 10 pounds occasionally; standing and walking for two hours out of an eight-hour day;

sitting for six hours; and all of the previously identified restrictions unchanged.  Tr. 89.  Upon

consideration of the ALJ's modified hypothetical, the VE indicated that there would be a range

of unskilled sedentary jobs available, including (1) assembly positions; (2) inspection positions

at a bench or table; and (3) packaging position at a bench or table.[8]  Tr. 90.

The ALJ then asked the VE whether the jobs identified would be impacted if the

individual who would have difficulty concentrating throughout the day so that the individual

would be off task up to one-third of the workday.  Tr. 90.  The VE indicated that being off task

that amount of the time would be work-preclusive.  Tr. 90.

In response to questioning by Williams' counsel, the VE indicated that a limitation of

missing work one day per week on an unscheduled and consistent basis due to isolating behavior

would be work-preclusive.  Tr. 91.

### III. Standard for Disability

**A.    Initial disability determination**

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

---

[7] The VE provided job incidence numbers for each of the identified jobs.  Tr. 89.

[8] The VE provided job incidence numbers for each of the identified jobs.  Tr. 90.

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work- but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## B.     Cessation of benefits

Once the Commissioner has found a claimant disabled, a claimant's continued entitlement to benefits must be reviewed periodically.  20 C.F.R. § 416.994(a).  When a claimant challenges the cessation of benefits, the central issue is whether the claimant's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue,* 247 Fed. Appx. 761, 764 (6th Cir. 2007). "There is no presumption of a continuing disability."  *Id.*  (citing *Cutlip v. Sec't of Health and Human Servs.*, 25 F.3d 284, 286-287, n. 1 (6th Cir. 1994); *Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358, 362-363 (6th Cir. 2001) (same).  To determine whether a claimant's disability has ceased and that she is now able to work, the Commissioner applies the procedures set forth in 20 C.F.R. § 416.994.   *Kennedy*, 247 Fed. Appx. at 764; *Nierzwick*, 7 Fed. Appx. at 361.

The specific steps under 20 C.F.R. § 416.944 that are followed by the Commissioner to review the question of whether a claimant's disability continues are as follows:

> 1.  Step 1.  Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter?  If you do, your disability will be found to continue.
>
> 2.  Step 2.   If you do not, has there been medical improvement as defined in paragraph (b)(1)(i) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step 3 in paragraph (b)(5)(iii) of this section. If there has been no decrease in medical severity, there has been no medical improvement. (See step 4 in paragraph (b)(5)(iv) of this section.)
>
> 3.  Step 3.  If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this

section. If medical improvement is related to your ability to do work, see step 5 in paragraph (b)(5)(v) of this section.

4.  Step 4.  If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of this section. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

5.  Step 5.  If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

6.  Step 6.  If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

7.  Step 7.  If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment made under paragraph (b)(5)(vi) of this section and your age, education, and past work experience (see paragraph (b)(5)(viii) of this section for an exception to this rule). If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

8.  Step 8.  We may proceed to the final step, described in paragraph (b)(5)(vii) of this section, if the evidence in your file about your past relevant work is not sufficient for us to make a finding under paragraph (b)(5)(vi) of this section about whether you can perform your past relevant work. If we find that you can adjust to other work based solely on your age, education, and residual functional capacity, we will find that you are no longer disabled, and we will not make a finding about whether you can do your past relevant work under paragraph

(b)(5)(vi) of this section. If we find that you may be unable to adjust to other work or if § 416.962 may apply, we will assess your claim under paragraph (b)(5)(vi) of this section and make a finding about whether you can perform your past relevant work.

20 C.F.R. § 416.994(b)(5)(i)-(viii).

The first part of the cessation analysis focuses on medical improvement. *Kennedy*, 247 Fed. Appx. at 764. "Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 416.994(b)(1)(i). Thus, "[i]mprovement is measured from 'the most recent favorable decision' that the claimant was disabled." *Kennedy*, 247 Fed. Appx. at 764; *see also White v. Colvin*, 2015 WL 1011393, * 4 (N.D. Ohio Mar. 6, 2015).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity. *Kennedy*, 247 Fed. Appx. at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* "[T]he ultimate burden of proof lies with the Commissioner in termination proceedings." *Id*; *see also Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358, 361 (6th Cir. 2001); *White*, 2015 WL 1011393, * 4.

### IV. The ALJ's Decision

In her September 26, 2014, decision, the ALJ made the following findings:[9]

1.    The most recent favorable medical decision finding that Williams was disabled is the decision dated April 18, 2005. This is known as the "comparison point decision" or CPD. Tr. 20.

2.    At the time of the CPD, the claimant had the following medically determinable impairments: severe major depression and anxiety disorder. These impairments were found to result in the following RFC: She

---

[9] The ALJ's findings are summarized.

retained the RFC to perform a full range of work physically and mentally cannot perform even unskilled work as her severe major depression and anxiety disorder substantially eroded her ability to respond appropriately to supervisors, co-workers and usual work situations and also dealing with changes in routine work setting.  Tr. 20.

3.  The medical evidence establishes that the claimant developed the following additional impairments after the CPD: degenerative disc disease of the cervical spine with radiculopathy and left shoulder tendinitis.  Tr. 20.  Non-severe impairments were mild hallux deformity and kidney stones.  Tr. 20.  Lower back pain was not a medically determined impairment.  Tr. 20.

4.  Since September 1, 2010, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of a listing.  Tr. 20-21.

5.  Medical improvement occurred as of September 1, 2010.  Tr. 21.  The medical evidence supports a finding that, as of September 1, 2010, there had been a decrease in medical severity of the impairments.  The claimant had no treatment for her CPD mental impairments in 2009.  Tr. 21.  Third party statements from the fall of 2011 showed that Williams worsened after surgeries in late 2010 and early 2011, with more severe physical pain than mental.  Tr. 21.  This evidence shows that Williams improved from the CPD, although she later developed different, but not disabling impairments.  Tr. 21.

6.  From September 1, 2010, through September 1, 2013, Williams had the RFC to perform light work except: she could lift or carry up to 20 pounds occasionally and 10 pounds frequently, with lifting and carrying done primarily with the dominant arm and the non-dominant arm assisting; she could stand or walk for six out of eight hours, and sit for six out of eight hours; she could frequently climb stairs and ramps; she could never climb ladders, ropes, scaffolds; she could bend, balance, stoop, kneel; she could never crawl; she could reach in front bilaterally, she could reach overhead with the dominant arm and only to shoulder level with the non-dominant arm; she could frequently handle, finger, and feel; she must have avoided all exposure to hazards; she could perform simple routine tasks with simple short instructions, make simple decisions, have few workplace changes, with no fast pace production quota, and not having responsibility for safety of others; she could have had superficial interaction with coworkers, supervisors and public, meaning that she could not perform any negotiation or confrontations or other such contact.  Tr. 21-26.

28

7.      Williams' medical improvement is related to the ability to work because it has resulted in an increase in Williams' RFC.  Tr. 26.  The RFC Williams has had since September 1, 2010 is less restrictive than the one Williams had at the time of the CPD.  Tr. 26.

8.      Beginning on September 1, 2010, Williams' impairments continued to be severe. Tr. 26.

9.      Williams has no past relevant work.  Tr. 26.

10.     On September 1, 2010, Williams was a younger individual age 18-49. Tr. 26.

11.     Williams has a limited education and is able to communicate in English. Tr. 26.

12.     Transferability of job skills is not an issue because Williams does not have past relevant work.  Tr. 26.

13.     Beginning on September 1, 2010, considering Williams' age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Williams could perform, including assembler, inspector, and packager.  Tr. 26-27.

Based on the foregoing, the ALJ determined that Williams' disability ended on September 1, 2010.  Tr.27.

## V. Parties' Arguments

Williams argues that the RFC is not supported by substantial evidence.  She contends that the ALJ: (1) failed to consider and evaluate all of her severe impairments, including trigger thumbs, anemia, and low body weight; (2) erred with respect to her consideration of the medical opinion evidence; and (3) failed to properly evaluate her allegations of pain.  Doc. 17, pp. 10-18.

In response, the Commissioner argues that the ALJ reasonably determined Williams' severe impairments; reasonably considered Williams' medication usage and allegations of pain; and reasonably evaluated the medical opinion evidence.  Doc. 19, pp. 14-21.

# VI. Law & Analysis

## A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## B.     The ALJ's determination that medical improvement occurred as of September 1, 2010, is unchallenged

As discussed above, in cases that involve cessation of benefits, the initial inquiry is whether there has been medical improvement, i.e., whether there has been "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most

recent favorable medical decision that you were disabled or continued to be disabled."  20 C.F.R.

§ 416.994(b)(1)(i).   In the April 18, 2005, CPD decision, it was determined that Williams had

severe major depression and anxiety disorder which resulted in Williams having the RFC:

> to perform a full range of work physically and mentally cannot perform even
> unskilled work as her severe major depression and anxiety disorder substantially
> eroded her ability to respond appropriately to supervisors, co-workers and usual
> work situations and also dealing with changes in routine work setting.

Tr. 20.

In the ALJ's September 26, 2014, decision under review in this case, the ALJ determined

that medical improvement had occurred as of September 1, 2010, stating:

> The medical evidence supports a finding that, as of September 1, 2010, there had
> been a decrease in medical severity of the impairments.  The claimant had no
> treatment for her CPD mental impairments in 2009.

> The third party statements in the record, all submitted in the fall of 2011; indicate
> that the claimant worsened after surgeries in late 2010 and early 2011, with more
> severe physical pain than mental symptoms. (exh. B9E pp2-3, BllE pl, Bl2E pl,
> B13E pl)[.]  This shows that she had improved from the CPD, although she later
> developed different, but not disabling impairments.

Tr. 21.

Williams does not challenge the ALJ's medical improvement decision.  Instead,

Williams' arguments are directed at the ALJ's RFC assessment.  Doc. 17, p. 10.  As discussed

more fully below, the undersigned finds no merit to Williams' contentions that the RFC is not

supported by substantial evidence.

## C.    The RFC is supported by substantial evidence

Williams presents three reasons why the RFC assessment is unsupported by substantial

evidence.  First, Williams contends that the ALJ erred at Step Two.  Doc. 17, pp. 10-14.  Next,

Williams asserts that the ALJ did not properly consider her allegations of pain, including the

types, dosages and side effects of her medications.  Doc. 17, pp. 15-16.  Finally, Williams argues

that the ALJ did not properly evaluate the opinion evidence concerning both her physical and mental impairments.  Doc. 17, pp. 14-15, 17.

**1.  The ALJ's Step Two determination is not a basis for reversal**

Williams argues that the ALJ erred at Step Two because she did not include an evaluation of Williams' bilateral trigger thumbs, anemia, and low body weight.  Doc. 17, pp. 10-14.

At Step Two, a claimant must show that she suffers from a severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 416.909,[10] or a combination of impairments that is severe and meets the duration requirement.  20 C.F.R. § 416.920(a)(4)(ii).  It is Williams' burden to show the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, *2 (6th Cir. 1990) (unpublished) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  An impairment is not considered severe when it does not significantly limit the claimant's physical or mental ability to do basic work activities (without considering the claimant's age, education, or work experience).[11]  *Long v. Apfel*, 1 Fed. Appx. 326, 330-332 (6th Cir. 2001); 20 C.F.R § 416.922(a).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle such that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition."  *Id.* at 863.

---

[10] The duration requirement provides that "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 416.909.

[11] Basic work activities are defined by the regulations as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.922(b).  Examples, include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) the capacity to see, hear and speak; (3) the ability to understand, carry out, and remember simple instructions; (4) use of judgment; (5) ability to respond appropriately to supervision, co-workers, and usual work situations; and (6) the ability to deal with changes in a routine work setting.  *Id.*

Additionally, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, error, if any, at Step Two may not warrant reversal. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process)*; see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some impairments were found to be non-severe at Step Two was not reversible error).

Williams claims that the ALJ's Step Two finding is flawed because the ALJ did not find her bilateral trigger thumbs, anemia, and/or low body weight to be severe impairments.  Doc. 17, pp. 10-14.  However, as indicated above, a diagnosis alone does not explain the severity of the condition and it is Williams' burden to show that her impairments are severe.   This she has not done.   Moreover, even if she could demonstrate that the ALJ should have concluded that her bilateral trigger thumbs, anemia, and/or low body weight were severe impairments, reversal is not warranted.  As reflected in the decision, the ALJ found that Williams had other severe impairments, i.e., major depression, anxiety disorder, degenerative disc disease of the cervical spine with radiculopathy, and left shoulder tendinitis (Tr. 20), and proceeded with subsequent steps in the sequential analysis (Tr. 21-27), and at those later steps, considered evidence relating to conditions that Williams contends that ALJ did not properly consider.  *See* Tr. 22 (discussing Dr. Sioson's observations that Williams was underweight with a BMI of 16.5); Tr. 23 (discussing the surgical release of Williams' bilateral trigger thumbs and Dr. Khalil's

observations of reduced grip and finger strength in the left hand); Tr. 25 (discussing Williams'
statements regarding her anemia and her 2010 hysterectomy).

Accordingly, the ALJ did not ignore Williams' bilateral trigger thumbs, anemia or low
body weight.  In fact, Williams acknowledges that the ALJ considered her bilateral trigger
thumbs condition but nonetheless contends that her other conditions along with her bilateral
trigger thumbs warranted greater limitations than those included in the RFC.  Doc. 17, pp. 11-12.
However, the regulations make clear that a claimant's RFC is an issue reserved to the
Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and
other evidence" of record.  20 C.F.R. §§ 416.945(a)(3), 416.946(c).   In assessing Williams'
RFC, the ALJ included manipulative limitations in the RFC.  Tr. 21.  More particularly, the ALJ
limited Williams in the RFC to frequent handling, fingering and feeling.  Tr. 21.  While Williams
disagrees with the RFC assessment, she has not shown that the ALJ failed to consider her
bilateral trigger thumbs nor has she demonstrated a basis upon which to conclude that greater
RFC limitations beyond those included in the RFC were necessary to account for any limitations
caused by her bilateral trigger thumbs.

Also, to the extent that Williams claims that her anemia and low body weight caused
fatigue and weakness (Tr. 17, pp. 13-14), she has failed to demonstrate that the RFC limitations,
which include an exertional limitation of light work, postural limitations, and a limitation of
simple and routine tasks with no fast pace production quota, do not adequately account for any
claimed fatigue or weakness.

Based on the foregoing, the undersigned concludes that reversal and remand is not
warranted based on the ALJ's Step Two determination.

### 2.   The ALJ properly considered Williams' allegations of pain

Williams argues that the RFC is not supported by substantial evidence because the ALJ did not discuss the numerous pain medications that Williams took which have "known side effects of drowsiness, excessive tiredness, and weakness." Doc. 17, pp. 15-16.  Williams also argues that the objective findings and tests support her complaints of pain.  Doc. 17, p. 16.

The undersigned finds no error with respect to the ALJ's assessment of Williams' allegations of pain.  In reaching this conclusion, the undersigned observes that an ALJ is not required to discuss every piece of evidence in order for a decision to be affirmed.  *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004).  Additionally, the ALJ did discuss some of Williams' medications, including one of her pain medications – Methadone (Tr. 25). Further, the ALJ's decision makes clear that the ALJ  considered Williams' allegations of pain (Doc. 22) and medical records and opinion evidence concerning her allegations of pain (Tr. 22-23) when assessing her RFC.   With respect to Williams' argument that objective findings and tests support her complaints of pain, Williams has not shown that the ALJ ignored the objective findings and tests.  *See* Tr. 22-24.  Thus, her argument amounts to a request that this Court reweigh evidence that the ALJ considered.  However, it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

Based on the foregoing, the undersigned concludes that the ALJ did not err in her consideration of Williams' allegations of pain.

### 3.  The ALJ properly considered the opinion evidence

Williams argues that the ALJ erred in her evaluation of the opinion evidence.  Doc. 17, pp. 14-15, 17.

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927.  *See* 20 C.F.R. § 416.927(c).  Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Id.*  However, even when the opinion at issue is rendered by a treating physician, which is not the situation in this case, the ALJ is not obliged to include in her decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

The Regulations also make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 416.945(a); 416.946(c).  The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 416.946 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

### a.  Physical impairment opinion evidence

With respect to the opinion evidence relating to Williams' physical impairments, Williams argues that the ALJ ignored some findings of consultative examining physician Dr. Sioson when assigning only some weight to his opinion and improperly relied upon the opinion of state agency reviewing physician Dr. Villaneuva.  Doc. 17, p. 14.  Also, in arguing that the ALJ's decision is not supported by substantial evidence, Williams states that the ALJ assigned more weight to Dr. Sioson's opinion and less weight to Dr. Villaneuva's opinion in her prior 2012 decision than in her 2014 decision.  Doc. 17, pp. 14-15.

Here, although neither Dr. Sioson nor Dr. Villanueva were treating physicians, the ALJ considered and explained the weight assigned to both opinions.

With respect to Dr. Sioson's opinion, Williams argues that the ALJ ignored Dr. Sioson's findings pertaining to Williams' reduced cervical spine extension and reduced ranges of motion in the lumbar spine and left upper extremity.  Doc. 17, p. 14.  Although the ALJ did not cite Dr. Sioson's examination findings verbatim, the ALJ considered the opinion of Dr. Sioson and explained that Dr. Sioson's sedentary activity limitation was based on his findings and her pain. Tr. 22-23.  In considering the opinion, the ALJ assigned some weight, indicating that, since Williams' pain complaints were not fully credible, full weight could not be assigned to the opinion, which was based in part on those complaints.  Tr. 23.  Also, the ALJ provided only some weight to Dr. Sioson's opinion because later examinations did not support limitations found during Dr. Sioson's examination, i.e., a later examination did not reveal a limitation in heel-toe walking.  Tr. 23, 413.  Williams has not demonstrated that the ALJ's reasons for providing only some weight to Dr. Sioson's opinion are not supported by substantial evidence.

With respect to Dr. Villaneuva's opinion, Williams suggests that the ALJ did not have a reasonable basis for assigning weight to Dr. Villaneuva's opinion because Dr. Villanueva concluded that Williams was only partially credible since she alleged painful conditions from working but had not worked since she was granted disability and did not have physical problems when initially granted disability.  Doc. 17, p. 14; Tr. 358.  However, the ALJ did not rely on Dr. Villaneuva's opinion because of the latter's assessment of Williams' credibility.  Rather, the ALJ assigned substantial weight to and relied upon Dr. Villanueva's opinion because the ALJ found Dr. Villanueva's exertional and postural limitations were consistent with exam findings showing good gait and normal strength.  Tr.  24.  The ALJ noted, however, that later evidence also showed that Williams had manipulative limitations, stating that "loss of grip and range of motion would limit [Williams'] reaching and manipulation as found."  Tr. 24.  Thus, not only did the ALJ explain the weight assigned to Dr. Villanueva's opinion, the ALJ also provided additional restrictions based on later evidence.  Tr. 24.  Williams has not demonstrated that the ALJ's reasons for providing substantial weight to Dr. Villanueva's opinion are unsupported by substantial evidence.

Williams suggests error with the ALJ's decision because the ALJ did not explain why she assigned less weight to Dr. Sioson's opinion in her 2014 decision than in her 2012 decision and more weight to Dr. Villaneuva's opinion in her 2014 decision than in her 2012 decision.  Doc. 17, pp. 14-15.  However, in remanding the case, the Appeals Council ordered the ALJ to "offer the claimant an opportunity for a hearing, take any further action needed to complete the administrative record, and issue a new decision."  Tr. 125 (emphasis supplied).   In the new 2014 decision, which is the final decision of the Commissioner under review by this Court, the ALJ

considered and explained the weight assigned to the opinions of Drs. Sioson and Villaneuva and Williams has not shown those reasons to be unsupported by substantial evidence.

### b.  Mental impairment opinion evidence

With respect to the opinion evidence relating to Williams' mental impairments, Williams argues that consultative examining psychologist Dr. Konieczny assigned a GAF score of 50 and the ALJ assigned great weight to Dr. Konieczny's opinion but incorrectly stated that a GAF score of 50 indicates moderate to serious symptoms. Doc. 17, p. 17.  In support of her argument, Williams states that a GAF of 51-60 indicates moderate symptoms whereas a score of 50 indicates serious symptoms or any serious impairment in social or occupational functioning. Doc. 17, p. 17.

Dr. Konieczny did assign a GAF score of 50, which falls within a range of GAF scores (41-50) that indicates serious symptoms.  *See* DSM-IV-TR, at 34 (indicating that a GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).").  However, as noted by the ALJ, Dr. Konieczny opined that Williams would have moderate limitations in certain areas such as relating to others and withstanding stress and pressure.  Tr. 23-24, 306.  In some other areas such as ability to understand and follow directions and overall level of judgment Dr. Konieczny opined that Williams had no or only mild impairments.  Tr. 306.  Considering Dr. Konieczny's opinion that Williams would at most have moderate limitations and considering that 50 is at the top range of the scores falling within the "serious symptoms" category, with the next closest range of scores, i.e., 51-60, indicating moderate symptoms, the undersigned cannot conclude that the ALJ's description of Dr. Konieczny's GAF score of 50 as reflective of <u>moderate to serious</u>

<u>symptoms</u> is inaccurate.   Furthermore, the undersigned finds that error, if any, in the ALJ's

description of Dr. Konieczny's opinion is harmless and not a basis for reversal and remand.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

March 29, 2017

_____
Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).